Filed 9/7/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MANNY VILLANUEVA et al.<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>FIDELITY NATIONAL TITLE COMPANY,<br><br>    Defendant and Appellant. | H041870, H042504<br>(Santa Clara County<br>Super. Ct. No. 1-10-CV173356) |

In their first appeal (case No. H041870), both plaintiff Manny Villanueva, individually and as class representative, and defendant Fidelity National Title Company (Fidelity) appeal from a judgment following a bench trial in this class action lawsuit alleging violations of the Unfair Competition Law (UCL) (Bus. & Prof. Code, §§ 17200 et seq.). Villanueva and the class (jointly Plaintiffs) allege Fidelity, an underwritten title company that handled Plaintiffs' escrow accounts, engaged in unlawful conduct under the UCL when it charged overnight mail delivery fees, courier fees, and document preparation or "draw deed" fees that were not listed in its schedule of rates filed with the Department of Insurance in violation of Insurance Code provisions governing the business of title insurance (Ins. Code, §§ 12401–12410.10, 12414.27).[1] Fidelity argues, among other things, that this lawsuit is barred by the statutory immunity in section 12414.26 for matters related to ratemaking. The trial court rejected Fidelity's immunity claim based on section 12414.26. It found that Fidelity's charges for overnight

---

[1] All undesignated statutory references are to the Insurance Code.

mail and courier services and some of the draw deed fees were unlawful because they were not included in Fidelity's rate schedules. The court granted Plaintiffs injunctive relief under the UCL, but denied their restitution claims.

On appeal, Plaintiffs contend the trial court erred in failing to award them restitution under the UCL and by granting judgment on the pleadings on their breach of fiduciary duty claim. In its appeal, Fidelity argues the trial court lacked subject matter jurisdiction over this action because section 12414.26 confers exclusive original jurisdiction over ratemaking on the Insurance Commissioner and this case involves ratemaking. Plaintiffs respond that Fidelity waived its immunity defense by limiting it to certain claims below. Fidelity also argues the named class representative lacked standing. Fidelity contends that under the statutory scheme it was required to file rates only for services it provided and not for services provided by third parties. It argues other allegedly unlawful charges were authorized by the Insurance Code and the trial court erred by enjoining past acts that are not likely to be repeated.

We will conclude Fidelity's immunity defense (§ 12414.26) is not subject to the forfeiture doctrine because it implicates the court's subject matter jurisdiction. We will also hold that this civil action is barred by the immunity in section 12414.26 and is subject to the exclusive original jurisdiction of the Insurance Commissioner because it challenges Fidelity's ratemaking-related activity. We will therefore reverse the judgment.

In their second appeal (case No. H042504), Plaintiffs challenge the trial court's post-judgment order denying their motion for attorney fees under the private attorney general attorney fees doctrine (Code Civ. Proc., § 1021.5). In that same appeal, Fidelity challenges the trial court's order awarding costs to Plaintiffs and granting Plaintiffs' motion to tax Fidelity's costs.

Since we conclude this civil action is barred by statutory immunity (§ 12414.26), Plaintiffs are no longer the prevailing party and are therefore not entitled to an award of

attorney fees.  We will therefore affirm the trial court's order denying Plaintiffs' motion for attorney fees.  In light of our conclusion on the merits, we will also reverse the trial court's order awarding Plaintiffs their costs, direct the court to enter a new order awarding costs to Fidelity, and remand to the trial court to determine the amount of the costs award.

## FACTS AND PROCEDURAL HISTORY

### I. State Regulation of Title Insurance; Fidelity's Role

The California Insurance Commissioner has general regulatory authority over the business of title insurance.  (Ins. Code, § 12340 et seq.; Cal. Code Regs., tit. 10, §§ 2355.1-2355.5.)  The "[b]usiness of title insurance," as defined in the Insurance Code, includes in relevant part:  "The performance by a title insurer, *an underwritten title company* or a controlled escrow company *of any service in conjunction with the issuance or contemplated issuance of a title policy including but not limited to the handling of any escrow, settlement or closing in connection therewith*; or the doing of or proposing to do any business, which is in substance the equivalent of any of the above.)  (§ 12340.3, subd. (c); italics added.)  The Insurance Code also defines " '[t]itle insurer,' " " 'underwritten title company,' " and " '[c]ontrolled escrow company.' "  (§§ 12340.4, 12340.5, 12340.6.)  We will discuss the statutory regulatory scheme in greater detail in the "Discussion" portion of this opinion.  Because the State of California regulates the business of title insurance, California title insurers are subject to very little regulation by the federal government.  (Greenwald & Asimow, Cal. Practice Guide: Real Property Transactions (The Rutter Group 2017) ¶¶ 3:61, pp. 3-17 to 3-18 (Greenwald), citing 15 USC App. §§ 1011-1015 [McCarran-Ferguson Insurance Regulation Act] & *Commander Leasing Co. v. Transamerica Title Ins. Co.* (10th Cir. 1973) 477 F.2d 77, 83, 89 [title

3

insurance companies are exempt from federal anti-trust laws when their business is regulated by the state where the alleged violation occurred].)

Fidelity is a subsidiary of Fidelity National Financial (FNF), which operates Fidelity and its other subsidiaries through the Fidelity National Title Group (FNTG). Fidelity has been licensed by the California Department of Insurance (DOI) to transact business as an underwritten title company since at least January 1996 in 21 California counties. Prior to that, beginning in November 1978, it was licensed as an underwritten title company to do business in Los Angeles County. The Insurance Code defines an underwritten title company as "any corporation engaged in the business of preparing title searches, title examinations, title reports, certificates or abstracts of title upon the basis of which a title insurer writes title policies." (§ 12340.5.) Fidelity is underwritten by Fidelity National Title Insurance Company (sometimes FNTIC).

The Insurance Code requires title insurers, underwritten title companies, and controlled escrow companies to file their "schedules of rates, all regularly issued forms of title policies to which such rates apply, and every modification thereof which [they] propose[] to use in this state" with the Insurance Commissioner and to "establish basic classifications of coverages and services to be used as the basis for determining rates." (§§ 12401.1, 12401.2.) In this litigation, Villanueva alleges—on behalf of himself and a class of similarly situated persons—that Fidelity violated the Insurance Code when it charged for certain services that were not listed on its schedule of rates filed with the Insurance Commissioner.

## II. Facts Regarding the Named Plaintiff's Escrow

The named plaintiff is Manny Villanueva. In 2006, Villanueva and his wife Sonia Villanueva refinanced the mortgage on their home in Santa Clara County. The refinance loan was arranged by mortgage broker UMG Mortgage. UMG Mortgage arranged for FNTIC to provided title insurance and for Fidelity to provide escrow services. Sonia

4

Villanueva was the sole borrower. She is not a party to this action. Although Mr. Villanueva was not a party to the loan agreement, he did sign the escrow instructions. (Hereafter, we shall refer to Manny Villanueva using the singular "Villanueva," to Sonia Villanueva by her complete name, to Manny and Sonia Villanueva jointly as "the Villanuevas.")

Among other things, the refinance transaction involved: (1) obtaining a new loan from First Federal Bank of California (First Federal); (2) paying off a first mortgage with Countrywide Home Loans, (3) paying off a second mortgage with Chase Home Finance, and (4) paying various fees, which left (5) a balance of $116,238.69 that was paid to the Villanuevas.

The Villanuevas incurred several expenses in connection with refinancing their mortgage, including payments to the new lender (First Federal), the mortgage broker, the homeowners' insurance carrier, the title insurer (FNTIC), escrow fees to Fidelity, and other fees. Fidelity charged the Villanuevas a base rate of $250 to handle their escrow. In addition to the base rate, Fidelity charged certain fees that are the subjects of this lawsuit, including a document preparation fee ($75), a "Draw Deed" fee ($50), an overnight delivery fee ($11.20), and a courier fee ($15).[2] Fidelity also charged other fees that are not at issue in this case. In addition, Fidelity gave the Villanuevas a $20 discount on escrow fees pursuant to the terms of a 2002 stipulated judgment in *People v. Fidelity National Title Insurance Co.*, Sacramento County Superior Court Case No. 99AS02793.[3]

---

[2] Fidelity charged both a $75 document preparation fee and a $50 "Draw Deed" fee to prepare a single grant deed. This was apparently due to human error that was discovered during the litigation. Fidelity offered to refund the overcharge plus interest. Plaintiffs do not allege any unlawful business practices based on double charging for services.

[3] In *People v. Fidelity National Title Insurance Co.*, the California Attorney General and others sued Fidelity and other companies in the business of title insurance for alleged violations of the Unclaimed Property Act and the UCL occurring between May 1995 and October 2002. The alleged illegal conduct included, among other things,

This litigation concerns the legality of amounts paid for delivery services and the "draw deed" fee. In their escrow instructions, the Villanuevas "authorize[d] and instruct[ed] [Fidelity] to charge each party to the escrow for their respective Federal Express, special mail handling/courier and/or incoming/outgoing wire transfer fees" and to "select special mail/delivery or courier service to be used." In the estimated closing statement, which was part of the escrow instructions, Fidelity estimated the escrow charges would include $30 for overnight delivery and $30 for "Outside Courier/Special Messenger."

The Villanuevas' escrow closed on May 31, 2006. Fidelity arranged for three deliveries to be made while the transaction was in escrow. The first delivery was via overnight mail by California Overnight from the Fidelity office in Milpitas to First Federal Bank in Los Angeles on May 23, 2006 (eight days before close of escrow). The Villanuevas' final escrow closing statement on the HUD-1 form[4] dated May 31, 2016,

_____

charging improper fees for services the defendants never intended to perform and charging fees that greatly exceeded the actual cost of the service, including fees for delivery services.

The terms of the stipulated judgment included an injunction permanently enjoining the defendants from, among other things, "[b]illing or collecting from title insurance or escrow customers an amount that exceeds the actual cost to defendants of services provided by third parties in connection with defendants' performance of escrow and title services, such as overnight mail, courier, and notary services, unless (1) such practice is permitted by state and federal law and (2) defendants clearly and conspicuously disclose that they have marked-up [*sic*] the third party charge." The stipulated judgment also provided for restitution, including cash payments to former customers and up to $26 million in the form of $20 discounts on future transactions to certain eligible customers.

[4] The federal Real Estate Settlement Procedures Act of 1974 (RESPA) (12 U.S.C. § 2601 et seq.) and Regulation X to the Real Estate Settlement Procedures Act (24 C.F.R. § 3500.1 et seq. (1999)) (Regulation X) "regulate[] the settlement process for certain residential real estate loan transactions throughout the nation that involve federally related mortgage loans. RESPA and Regulation X require certain disclosures be made to borrowers by lenders both at the time of application for a loan and at the time of closing of the loan, including disclosure of charges that the borrower will have to pay for

6

lists a fee of $11.20 for this delivery. Five days after closing, California Overnight billed Fidelity $4.60 for this delivery.

The second delivery was via overnight mail by Federal Express (FedEx) from the Fidelity office in Milpitas, California to Chase Home Finance in Columbus, Ohio on May 31, 2006 (at close of escrow). FedEx charged Fidelity a "[c]ourtesy [r]ate" of $5.75 for this delivery. Fidelity did not include a separate charge for the FedEx delivery on the Villanuevas' final escrow closing statement on the HUD-1 form.

The third delivery was made by First Courier (also referred to as Tri-Valley Courier) from the Fidelity office in Milpitas to mortgage broker UMG Mortgage in Milpitas at close of escrow on May 31, 2006. First Courier charged $15 for this delivery. It was listed as $15 for "Outside courier/Special Messenger" on the Villanuevas' final escrow closing statement.

### III.    *Fidelity's Rate Filings*

The evidence at trial included several the rate manuals (also described as "rate schedules" or "rate filings") that Fidelity filed with the DOI with effective dates between May 2006 and August 2013. The schedule of rates governing the Villanuevas' transaction is set forth in Fidelity's rate manual entitled "Escrow Fees and Charges for the State of California," effective May 22, 2006. The escrow rate tables in the rate manual are organized by counties. According to the manual, "[f]or escrows involving the refinancing of an existing deed of trust on a one-to-four [*sic*] family residence," in Santa Clara County, the charge shall be $250 on transactions up to and including $1 million.

---

settlement services such as credit reports, appraisal fees, recording fees, wire transfer fees, and other loan related services." (*Washington Mutual Bank v. Superior Court* (1999) 75 Cal.App.4th 773, 776.) RESPA requires lenders throughout the nation to use a standard uniform settlement statement form at the time of settlement, or closing, which is known as the "HUD-1 form." (*Id.* at p. 776, 779.)

7

The schedule provided that "[f]or the purpose of this section only, 'Refinance Escrow Services' shall include the following services:  (a) ordering demands and making payoffs on up to two (2) previous loans by either check or wire transfer; (b) disburse balance of proceeds, by either check or wire transfer, to up to 4 payees; and (c) company-performed in office document signing of one set of loan documents; and (d) standard in-house courier services.  Refinance Escrow services do not include notary fees, . . . recording fees, transfer tax or other governmental fees or charges."  The schedule also lists nine "Refinance Related Services," which are described as charges "[i]n excess of escrow services included in the above[-]referenced paragraphs"  The nine services listed include "Document Preparation" at $75 per document, but not delivery or courier services by outside vendors like FedEx, California Overnight, or First Courier.  The Villanuevas did not review Fidelity's rate manual at any time during the escrow process.  Villanueva alleges in the operative complaint, on information and belief, "that no individual consumer has ever visited the [DOI] archive to check the . . . escrow rate prior to the close of their real estate transaction.  Instead, like Plaintiff they would trust title and escrow professionals to charge them the correct rates."

## IV.  *Pretrial Procedural History*

Villanueva's class action complaint alleges Fidelity engaged in unlawful conduct by charging him and others for delivery services and draw deed fees that were not listed on Fidelity's rate filings with the Insurance Commissioner.  Villanueva's original complaint, filed in May 2010, contained causes of action for violations of the Unfair Competitor Law (UCL) (Bus. & Prof. Code, § 17200 et seq.), fraud, negligent misrepresentation, negligence, unjust enrichment, money had and received, and breach of fiduciary duty.  It also contained a prayer for punitive damages.  The named defendants included Fidelity (the escrow company), FNTIC (the title insurer), and Fidelity National Title Company of California (FNTC-CA) (hereafter jointly "Defendants").

8

Defendants filed demurrers to the original and the first amended complaints. The papers in support of and opposing both demurrers, as well as the orders on the demurrers, are not in the record. According to the statement of decision after trial, the trial court sustained the demurrers to the causes of action for fraud, negligence, and negligent misrepresentation in the original complaint with leave to amend. Villanueva elected not to amend his cause of action for negligence and did not include that claim in his first amended complaint. As for the demurrer to the first amended complaint, the trial court sustained the demurrers to the causes of action for fraud and negligent misrepresentation with leave to amend and overruled the demurrers to the other causes of action. Villanueva elected not to amend the complaint.

Defendants filed their answer in December 2011. In 2012, Villanueva dismissed the action without prejudice as to FNTC-CA and FNTIC, which left Fidelity as the only named defendant.

In February 2013, the Court certified a class of " '[a]ll persons for whom [Fidelity] performed residential escrow services in a transaction that occurred in California, and who were charged for courier, overnight, messenger, or other delivery services and/or draw deed fees in connection with that transaction, during the period May 28, 2006 through September 30, 2012.' " For ease of reference, we shall sometimes refer to the overnight mail, messenger, courier, and other delivery services jointly as "delivery services."

In July 2013, the court granted Fidelity's motion for summary adjudication of the punitive damages claim, but denied summary adjudication of other issues and denied summary judgment. Plaintiffs do not challenge that order on appeal.

In September 2013, Fidelity filed a motion for judgment on the pleadings challenging Plaintiffs' common law claims for unjust enrichment, money had and received, and breach of fiduciary duty, but not the UCL claim. The trial court granted the motion with leave to amend. Plaintiffs elected not to amend their complaint. On appeal,

9

Plaintiffs challenge the trial court's order granting judgment on the pleadings on the breach of fiduciary duty claim only.

In February 2014, the court denied Fidelity's separate motion for judgment on the pleadings on the UCL claim. When the case went to trial, the only remaining cause of action was the UCL claim (Bus. & Prof. Code, § 17200 et seq.). The court conducted a bench trial in the complex litigation department over 16 days in April, May, and June 2014.

## V. *Evidence Presented and Theories of Liability Argued at Trial*

At trial, Plaintiffs argued two alternate theories of liability related to alleged unlawful charges for delivery services. They sought injunctive relief and requested approximately $13.1 million in restitution for third party delivery services. Plaintiffs also alleged Fidelity's " 'draw deed' " fees were unlawful and sought approximately $10.7 in restitution for the draw deed fees.[5] A subset of the class sought $1.8 million in restitution for draw deed fees on an alternative theory of liability.

### A. Delivery Theory No. 1

Plaintiffs' Delivery Theory No. 1—which the trial court and the parties also described as the " 'unfiled rate' claim"—posited that the charges for delivery services provided by third parties were unlawful because Fidelity was required to file its rates for third party delivery services with the DOI and those rates were not included in Fidelity's rate filings. Fidelity contended the Insurance Code does not require it to file rates for "[p]ass [t]hrough" delivery fees that it collects from its customers and passes through to third party delivery service providers. Fidelity argued that the Insurance Code requires it

---

[5] Plaintiffs sought the following amounts in restitution in their closing argument: "For delivery fees, $13,115,370 without interest. $17,914,082 with interest. For draw deed fees: $10,670,982 without interest. $14,176,895 with interest."

to file rates only for services "it performs" (§ 12340.7) and that it was not required to file rates for delivery services performed by others.

Plaintiffs disputed Fidelity's characterization of the delivery fees as "[p]ass-[t]hroughs" based on agreements between certain delivery services and a Fidelity affiliate under which "escrow customers receive[d] discounted delivery rates" and the delivery companies paid the Fidelity affiliate "marketing fees." They argued that the Insurance Code required Fidelity to include a statement in its rate filings (for example "as charged by vendor") that would provide notice that such fees would be collected.

### B. Delivery Theory No. 2

Alternatively, Plaintiffs' Delivery Theory No. 2—also described as the " 'double charge' claim"—asserted that the charges for delivery services were unlawful because they were part of the services included in Fidelity's base rate—which the parties also refer to as a "bundled rate"—and that by charging both the base rate and separate fees for delivery, Fidelity billed its customers twice for the same service. Fidelity disagreed with Plaintiffs' interpretation of the language in its rate filings that Plaintiffs relied on as the basis for Delivery Theory No. 2.

### C. Draw Deed Theory

A subset of plaintiffs—which the trial court referred to as the " 'Draw Deed Plaintiffs' "—argued that Fidelity could not charge its filed rate for " 'document preparation' " for preparing a deed if the customers' HUD-1 closing statement described the service as " 'draw deed' " instead of " 'document preparation.' " Plaintiffs sought restitution of approximately $10.7 million under this theory. We shall hereafter refer to this claim as the General Draw Deed Theory.

Plaintiffs asserted an alternative theory of liability with regard to a subset of the Draw Deed Plaintiffs whose escrows involved real estate sale transactions (as opposed to

11

refinance transactions) between May 28, 2006 and February 2, 2008—which the trial court referred to as the " 'Gap Period Plaintiffs.' "  The Gap Period Plaintiffs contended that Fidelity's rate filings during that period did not include a rate for " 'document preparation' " for real estate sales transactions.  They argued that Fidelity's failure to have filed a rate for document preparation for sales transactions made their charges for drawing a deed unlawful even if Fidelity's filed rate for " 'document preparation' " authorized draw deed charges in other instances.  The Gap Period Plaintiffs sought approximately $1.8 million in restitution.[6]

## VI.  *Motion for Nonsuit; Statement of Decision*

After Plaintiffs' opening statement, Fidelity made three motions for nonsuit, one of which was based on its statutory immunity defense (§ 12414.26).  The trial court denied each of the motions.

The court issued its final statement of decision in November 2014.  The court concluded that the delivery services were made in connection with Fidelity's handling of the class members' escrows.  It found that delivery of escrow funds and documents was a "necessary" and "integral" part of an escrow holder's function, even if accomplished by using third party delivery services.  The court reasoned that the delivery fees were expenses Fidelity incurred to carry out "a core part of" its function as escrow holder, that Fidelity—and not the class members—contracted with the delivery companies and was obligated to pay them, that the delivery fees were not " 'pass-through' " charges and were therefore charges by Fidelity.  Construing section 12414.27, the court found the statute was not ambiguous and that its plain language broadly prohibits Fidelity from charging for any service that does not match its rate filings, including delivery services.  The court

---

[6]  For the Gap Period, Plaintiffs sought draw deed fees of $1,800,973 without interest and $2,696,986 with interest.

held that the legislative history of the statutory scheme, the purpose of the statutory scheme, and the DOI's interpretation of the statute all supported its conclusions.

On Plaintiffs' Delivery Theory No. 1, the court found that Fidelity violated section 12414.27 by charging for delivery services because its rate filings did not include a rate for such service or a general statement that the rate would be that charged by a third party delivery service. In light of its conclusion, the court did not reach the merits of Delivery Theory No. 2.

Regarding the General Draw Deed Theory, the court rejected Plaintiffs' assertion that drawing a deed was different from document preparation. The court found that statistical evidence presented at trial substantiated Fidelity's testimony that its regular practice was to charge the document preparation rate, regardless of whether the service was labelled as " 'document preparation' " or " 'draw deed' " on the HUD-1 form. The court found that Fidelity's rate filings during the Gap Period (May 28, 2006, to February 2, 2008) "for sale/resale transactions (as contrasted with refinance transactions) did not include a rate for either . . . drawing a deed or document preparation" and that during that time, "Fidelity charged $1,800,973 in draw deed fees. [(Fns. omitted.)]" The court rejected Fidelity's assertion that those fees were "unusual services" within the meaning of section 12401.8. The court held "that charging for drawing a deed was unlawful during the Gap Period," but that Fidelity "did not violate the law by charging for the service of drawing a deed outside the Gap Period."

The court found that in the Villanuevas' transaction, "due to human error, Fidelity inadvertently listed two charges for preparing the Grant Deed, instead of one, and at different rates"—the $75 document preparation fee and the $50 draw deed fee. The court noted that "Fidelity sought to refund the mistaken second charge per company policy [(fn. omitted.)]" and found "no evidence that such an individualized error occurred in any other class transaction." It found that charging $50 for document preparation in the Villanuevas' case, when the filed rate was $75, was "atypical of the class."

13

The court also rejected Fidelity's statutory immunity claim under section 12414.26 and found that the statute did not immunize Fidelity from suit based on its unlawful charges.

With regard to remedies, the court found that although Plaintiffs had established legal violations by Fidelity, they had failed to prove they were entitled to restitution. The court reasoned that Plaintiffs "received the benefit of their bargain" and noted they did not contend that the services were unwarranted, "unsatisfactory, or unfairly priced, and all of the services and rates were disclosed up-front and agreed to by Plaintiffs." The court concluded that (1) Plaintiffs benefitted from Fidelity's preparation of deeds and its negotiation of low third party delivery service fees that were lower than those charged by other escrow holders; (2) the fees were disclosed to and approved by Plaintiffs in their estimated closing statements; (3) Plaintiffs failed to show economic injury as a result of omissions from rate manuals they neither reviewed nor relied on; and (4) awarding restitution would "put Plaintiffs in a better position than they expected to receive."

Although it denied restitution, the court concluded that Plaintiffs were entitled to injunctive relief. While Fidelity's most recent rate filings included rates for delivery services, the court found it was "appropriate to enjoin Fidelity from charging for the service of delivery unless its rate filing includes the charge or a statement that the rate will be the amount charged by the third party vendors for delivery fees."

## VII.    *Motions for Attorney Fees and Costs*

In January 2015, Plaintiffs filed a motion for attorney fees under Code of Civil Procedure section 1021.5, which codifies the private attorney general attorney fee doctrine. (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1217-1218.) Plaintiff

sought $9,439,929 in attorney fees based on the work of nine lawyers in two different law firms.[7]

Code of Civil Procedure section 1021.5 provides in relevant part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, . . . , are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." The trial court concluded that Plaintiffs were not entitled to attorney fees under Code of Civil Procedure section 1021.5. The court reasoned that although the litigation involved an important right affecting the public interest, Plaintiffs had not met their burden of establishing the significant benefit element or that private enforcement was necessary or that the necessity and financial burden of private enforcement were such as to make the award appropriate. Thus, the court denied Plaintiffs' motion for attorney fees.

In December 2014, both sides filed a memorandum of costs. Plaintiffs sought $393,862.19 in costs and Fidelity claimed $197,839.41 in costs. Both parties filed motions to tax the other side's costs. The trial court concluded that since the only relief Plaintiffs obtained was an injunction and they had not obtained any monetary relief, it had discretion under Code of Civil Procedure section 1032, subdivision (a)(4) to determine which party was the prevailing party, whether costs should be awarded, and in what amount. The court concluded that Plaintiffs were the prevailing party and awarded

---

[7] The attorneys billed at different rates ranging from $395 per hour to $800 per hour depending on their experience. (After applying reductions and a multiplier, and based on 11,284.65 hours billed, Plaintiffs' attorney fees claim yields an average hourly rate of $836.53 per hour.)

15

them the entire amount claimed as costs.  Consequently, the court denied Fidelity's motion to tax Plaintiff's costs and granted Plaintiffs' motion to tax Fidelity's costs.

## PARTIES' CONTENTIONS

Both sides appeal the judgment and the post-judgment order denying Plaintiffs' motion for attorney fees and awarding costs to Plaintiffs.  In their appeal on the merits, Plaintiffs do not challenge the trial court's ruling on Delivery Theory No. 2 or its ruling regarding the Draw Deed charges outside the Gap Period.  Only the rulings on Delivery Theory No. 1 and the Draw Deed claims of the Gap Period Plaintiffs are at issue here. Plaintiff contend the trial court erred in failing to award them restitution under the UCL and by granting judgment on the pleadings on their breach of fiduciary duty claim.  They argue that if this court reverses as to restitution, the case should be remanded to the trial court on the question of attorney fees.

In its appeal on the merits, Fidelity argues that the judgment must be reversed because the trial court lacked subject matter jurisdiction for two independent reasons. First, Fidelity contends it was immune from suit under section 12414.26, which it argues consigns all issues regarding filed rates to the discretion of the Insurance Commissioner and prohibits courts from second-guessing Fidelity's filed rates.  Second, Fidelity contends Villanueva, the named class representative, lacked standing because he was not the borrower and paid no fees related to his wife's loan transaction.

Fidelity contends that even if the court had jurisdiction over the subject matter of the action, the judgment on Delivery Theory No. 1 must be reversed because the trial court misinterpreted and misapplied section 12414.27.  Fidelity argues section 12414.27 required it to file rates for services it provided and did not require it to file rates for delivery services provided by third parties.  Fidelity contends the judgment on the claims of the Gap Period Plaintiffs must be reversed because the charges were authorized as

16

excess charges by section 12401.8. It also asserts the trial court erred by enjoining past acts that are not likely to be repeated.

As for the postjudgment order on attorney fees and costs, Plaintiffs appeal the trial court's order denying their motion for attorney fees. Fidelity challenges the court's order awarding costs to Plaintiff and granting Plaintiffs' motion to tax Fidelity's costs.

## I. Brief Introduction to Statutory Scheme Governing Title Insurance

The statutory scheme at issue in this appeal is found in division 2 of the Insurance Code, which is entitled "Classes of Insurance." We are concerned with part 6 of division 2, which governs "Insurance Covering Land." Part 6 is divided into three chapters. Chapter 1 of part 6 contains the provisions regarding "Title Insurance."

---

[8] In reviewing this appeal, we noted two deficiencies in the parties' briefs regarding citations to the record. First, they neglected to support each and every statement in their briefs concerning matters in the appellate record, whether factual or procedural, with a citation to the record. (Cal. Rules of Court, rule 8.204(a)(1)(C); *Myers v. Trendwest Resorts, Inc*. (2009) 178 Cal.App.4th 735, 745 (*Myers*); *City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239 (*Barringer*) [record citations in statement of facts do not cure failure to include record citations in argument portion of brief].) This allows the reviewing court to locate relevant portions of the record expeditiously. (*Myers*, at p. 745.) It is especially important in a case such as this that has a very large record (over 3,250 pages of appendices and 2,096 pages of reporter's transcript in case No. H041870 alone). When a brief fails to refer to the record in connection with the points raised on appeal, the appellate court may treat those points as having been waived, (*Barringer*, *supra*, 102 Cal.App.4th at p. 1239; *Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 799-801), ignore unsupported contentions, (*Dominguez v. Financial Indemnity Co*. (2010) 183 Cal.App.4th 388, 392, fn. 2), or strike portions of the brief entirely (*Ojavan Investors, Inc. v. California Coastal Com.* (1997) 54 Cal.App.4th 373, 391).

Second, Plaintiffs argue *substantial evidence* supports the trial court's implied finding that Fidelity's charges were not made in accordance with its rate filings. Rather than cite the *evidence* that supports the finding, Plaintiffs cite the court's *statement of decision*, which contains the court's findings. The statement of decision is not evidence. (See *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 178, fn.4 [citation to the separate statement, rather than the evidence, in a summary judgment appeal is inadequate; a separate statement is not evidence; assertions of fact in appellate briefs "should be followed by a citation to the page(s) of the record containing the supporting evidence"].)

We shall ignore statements in the briefs that are unsupported by appropriate record citations or that improperly cite the statement of decision. Since we decide this case based on questions of law and statutory interpretation, these deficiencies in the briefs are not dispositive.

Chapter 1, is divided into 16 articles. Although we will discuss the entire statutory scheme, we are concerned primarily with statutes in five of those articles: (1) article 1, which contains pertinent definitions (§§ 12340 to 12342); (2) article 5.5, which is entitled "Rate Filing and Regulation" (§§ 12401 to 12401.10); (3) article 5.7, which is entitled "Advisory Organizations" (§§ 12402 to 12402.2); (4) article 6.7, entitled "Hearings, Procedure, and Judicial Review" (§§ 12414.13 to 12414.19); and (5) article 6.9, entitled "Examinations, Penalties, and Miscellaneous" (§§ 12414.20 to 12414.31). (Stats. 1973, ch. 1130, pp. 2300, 2307, 2309, 2311, 2313.) For ease of reference, we shall refer to chapter 1 of part 6 of division 2 of the Insurance Code, the statutory scheme governing title insurance, as "Chapter 1" or "Chapter 1 (Title Insurance)."

Chapter 1 refers to three types of regulated entities in the business of title insurance: title insurers, underwritten title companies, and controlled escrow companies; (See e.g., §§ 12340.7, 12401.1, 12401.2, 12401.3, subd. (c), 12401.7, 12414.27; see also §§ 12340.4 to 12340.6 [defining "title insurer," "underwritten title company," and " '[c]ontrolled escrow company' "].) We will refer to all three types of entities jointly as "regulated title entities." Since Fidelity is an underwritten title company and for ease of reference, we will sometimes delete references to title insurers, controlled escrow companies, and advisory organizations, as well as insurance coverages provided by title insurers when describing the Insurance Code sections at issue.

## II. General Principles Under the Unfair Competition Law

"The UCL prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.' ([Bus. & Prof. Code,] § 17200.) Its purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.' (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 949, . . . .) In service of that purpose, the Legislature framed the UCL's substantive provisions in ' "broad, sweeping language" ' [citations] and provided

19

'courts with broad equitable powers to remedy violations' [citation]." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 320, citing *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 181 (*Cel-Tech*) and *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1266 ["The Legislature intended this 'sweeping language' to include ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' "].)  The UCL "governs 'anti-competitive business practices' as well as injuries to consumers, and has as a major purpose 'the preservation of fair business competition.' " (*Cel-Tech*, at p. 180.)

Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three types of unfair competition:  acts or practices that are (1) unlawful, or (2) unfair, or (3) fraudulent.  (*Cel-Tech*, *supra*, 20 Cal.4th at p. 180.) " ' "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." ' " (*Ibid.*)  Plaintiffs pleaded their UCL claim "under the unlawful prong of the statute on behalf of approximately half a million people."

As we have noted, " '[u]nlawful business activity' proscribed under [Business and Professions Code] section 17200 includes ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' [Citation.]  . . .  '[In] essence, an action based on Business and Professions Code section 17200 to redress an unlawful business practice "borrows" violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under [Business and Professions Code] section 17200 et seq. and subject to the distinct remedies provided thereunder.' " (*Farmers Ins. Exchange v. Superior Court* (1998) 2 Cal.4th 377, 383.)  The UCL claim in this case is based on alleged violations of the Insurance Code provisions governing the business of title insurance.

In evaluating Plaintiffs' UCL claims, we review questions of law and statutory interpretation de novo.  (*People ex rel. Lockyer v. Shamrock Foods Co*. (2000) 24 Cal.4th 415, 432.)  We review the trial court's resolution of disputed factual issues "for

20

substantial evidence, viewing the record in the light most favorable to the ruling.". (*People ex rel. Lockyer v. Fremont Life Ins. Co.* (2002) 104 Cal.App.4th 508, 514.)

We begin with the jurisdictional questions raised by Fidelity's appeal, including the application of statutory immunity.

### III. *Fidelity's Appeal in Case No. H041870: Statutory Immunity*

Section 12414.26 provides: "No act done, action taken, or agreement made pursuant to the authority conferred by Article 5.5 . . . of this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this state heretofore or hereafter enacted which does not specifically refer to insurance." Fidelity contends it is immune from suit under section 12414.26 and that the Insurance Commissioner has exclusive original jurisdiction over all matters related to the making, filing, and use of its rates. It argues this statutory immunity is broad and bars the entire action.

Plaintiffs contend Fidelity has forfeited its immunity defense by limiting it to Delivery Theory No. 2 and the General Draw Deed claims in the trial court. On the merits of the immunity issue, Plaintiffs argue both the plain language of section 12414.26 and case law defeats Fidelity's immunity argument. They contend the statutory immunity does not extend to Fidelity's conduct of charging for services that were not included in its rate filings and that this action is not related to ratemaking activity.

#### A. Background

The trial court first addressed the immunity question in its ruling on Fidelity's motion for nonsuit following Plaintiffs' opening statement. The court's tentative ruling on the motion for nonsuit, which it later adopted, stated: "Article 5.5 pertains to 'Rate Filing and Regulation.' Acts done or taken pursuant to the authority conferred by Article 5.5 include filing a schedule of rates with the commissioner (§ 12401.1), establishing

basic classifications of coverages and services to be used as the basis for determining rates (§ 12401.2), making and using rates subject to rate standards that require rates not to be excessive, inadequate or unfairly discriminatory (§ 12401.3), and exchanging information and experience data with insurance supervisory officials (§ 12401.4)." The trial court limited its immunity analysis to Delivery Theory No. 2 and the Draw Deed Theory. It reasoned that the conduct at issue under these theories was "charging of *unauthorized* fees" and since the charges were not in the rate filings, Fidelity obtained no authority from article 5.5 to charge those fees, and immunity did not apply. "Here Plaintiff does not challenge [Fidelity's] collection of fees 'consistent with an approved rate'; rather . . . fees beyond the approved rates."

In its statement of decision, the trial court wrote: "[S]ection 12414.26 does not immunize Fidelity from suit for its unlawful charges. Section 12414.26 confers immunity for an 'act done, action taken, or agreement made pursuant to the authority conferred by Article 5.5 . . . .' Section 12414.26 does not apply because Article 5.5 did not authorize the unlawful charges. Nothing in Article 5.5 authorizes the charges for a service other than in accordance with the rate filings."

## B. Waiver/Forfeiture

Plaintiffs contend Fidelity waived its immunity defense with regard to Delivery Theory No. 1 because Fidelity's motion for nonsuit expressly limited its immunity defense to Delivery Theory No. 2 and the Draw Deed claims. Generally, trial court error is waived by implication or deemed forfeited when the appellant fails to bring the alleged error to the trial court's attention by timely motion or objection. (*Doers v. Golden Gate Bridge, Highway & Transportation Dist*. (1979) 23 Cal.3d 180, 184-185, fn. 1; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 826.)

Fidelity responds that it did not forfeit its immunity defense as to any of Plaintiffs' theories of liability. It argues that although its written motion for nonsuit briefed the

22

immunity defense as to only Delivery Theory No. 2 and the Draw Deed claims, at the oral argument on the motion, Fidelity's counsel argued that immunity applied to all of Plaintiffs' claims. Alternatively, Fidelity argues that since the immunity affects the trial court's subject matter jurisdiction, the issue has not been waived or forfeited. We shall not address Fidelity's first point because its second point resolves the forfeiture question.

In the absence of subject matter jurisdiction, a court has no power to hear or determine a case. (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 196.) The existence of subject matter jurisdiction is a question of law, which we review de novo. (*Robbins v. Foothill Nissan* (1994) 22 Cal.App.4th 1769, 1774.) Issues affecting the trial court's subject matter jurisdiction are never forfeited and can be asserted for the first time on appeal, at any stage of the appellate process. (*Consolidated Theatres, Inc. v. Theatrical Stage Employees Union, Local 16* (1968) 69 Cal.2d 713, 721 (*Consolidated Theatres*) [whether action arising out of labor dispute was within exclusive jurisdiction of NLRB]; *San Joaquin County Human Services Agency v. Marcus W.* (2010) 185 Cal.App.4th 182, 187-188 ["lack of fundamental jurisdiction is not subject to the forfeiture doctrine"]; *In re Marriage of Oddino* (1997) 16 Cal.4th 67, 73 [issue of subject matter jurisdiction raised for first time in petition for review "must be addressed"].)

The questions whether the immunity in section 12414.26 bars this civil action and whether the case is subject to the exclusive original jurisdiction of the Insurance Commissioner are analogous to the issue presented in *Consolidated Theatres*, *supra*, 69 Cal.2d 713. Since this question implicates the court's subject matter jurisdiction, it may be raised at any time, even for the first time on appeal. We therefore conclude Fidelity has not forfeited its claims on appeal regarding its immunity defense. In light of our conclusion, we shall not address the question whether the argument below preserved the issue.

23

## C. Standard of Review

Whether this action is barred by the statutory immunity in section 12414.26 and the interpretation of the statutory scheme in Chapter 1 (Title Insurance) is a question of law, which we review de novo. (*People ex rel. Lockyer v. Shamrock Foods Co.*, *supra*, 24 Cal.4th at p. 432.) Application of the interpreted statute to undisputed facts is also a question of law subject to our independent review. (*International Engine Parts, Inc. v. Fedderson & Co.* (1995) 9 Cal.4th 606, 611.)

## D. Rules of Statutory Construction

"In construing a statute, our fundamental task is to ascertain the Legislature's intent so as to effectuate the purpose of the statute. [Citation.] We begin with the language of the statute, giving the words their usual and ordinary meaning. [Citation.] The language must be construed 'in the context of the statute as a whole and the overall statutory scheme, and we give "significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' [Citation.] In other words, ' "we do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' [Citation.]" ' [Citation.] If the statutory terms are ambiguous, we may examine extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we choose the construction that comports most closely with the Legislature's apparent intent, endeavoring to promote rather than defeat the statute's general purpose, and avoiding a construction that would lead to absurd consequences. [Citation.]" (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83 (*Smith*).)

### E. Statutory Scheme Governing Regulated Title Entities

The California Supreme Court has observed that "in some instances, an action may not lie under the UCL because another statutory scheme provides the exclusive means for resolving disputes." (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1126 (*Loeffler*).)  As examples of such statutory schemes, the *Loeffler* court cited the exclusive remedy provision of the workers' compensation law and two statutory schemes in the Insurance Code involving insolvent insurers and casualty insurance rates.  (*Id.* at pp. 1126-1127, citing *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 811–812 [workers compensation exclusive remedy, Lab. Code §§ 3201 et seq.] and *State of California v. Altus Finance* (2005) 36 Cal.4th 1284, 1291 (*Altus*) [restitution remedy under UCL barred by § 1037 in cases involving insolvent insurers] and *MacKay v. Superior Court* (2010) 188 Cal.App.4th 1427, 1434, 1441–1443 (*MacKay*) [immunity under § 1860.1; statutory administrative process is exclusive means of challenging auto insurance rates that the DOI has approved].)  Citing *Altus*, the Supreme Court explained that section 1037 gives the Insurance Commissioner exclusive authority to bring a civil action when an insurer is insolvent and held that "the Attorney General may not bring a UCL action for restitution that 'trespasses directly on the core function of the [Insurance] Commissioner.' " (*Loeffler*, at pp. 1126-1127.)  Citing *MacKay*, the court stated that "a UCL action will not lie to challenge an insurance rate previously approved by the [Department] of Insurance." (*Ibid.*)  The question presented here is whether the statutory immunity in Chapter 1 (§ 12414.26) bars this action challenging the use rates for which there have been no rate filings; rates that have neither been approved nor accepted by the Insurance Commissioner.

Fidelity argues the section 12414.26 immunity is broad and that a "review of Article 5.5 shows that it encompasses *all conduct* Fidelity performs in conducting the

business of title insurance," including "the making and use of the rate filings and the agreements to pay fees" (italics added). Fidelity interprets the immunity too broadly.

The Insurance Code contains a comprehensive scheme for the regulation and enforcement of entities and persons engaged in the business of title insurance. (See summary at 12 Witkin, Summary of Cal. Law (11th ed. 2107) Real Property, § 367, pp. 423-424.) Excluding the definitions in article 1, Chapter 1 (Title Insurance) is divided into 15 articles that regulate various aspects of the business of title insurance. Under Chapter 1, title insurers must maintain financial stability (§§ 12350 to 12388 [arts. 2, 3, and 3.5]) and underwritten title companies must furnish quarterly financial statements to the Insurance Commissioner (§ 12389.4 [art. 3.7]). Rates and commissions are regulated for all regulated title entities (§§ 12401 et seq. [art. 5.5 "Rate Filing and Regulation] and §§ 12404 et seq. [art. 6 "Rebates and Commissions"]) and rebates and discounts are prohibited (§ 12405). Rate schedules must be filed with the Insurance Commissioner, posted in the regulated title entity's place of business, and made available to the public (§ 12401.9 [art. 5.5]). Under article 6 of Chapter 1, regulated title entities are subject to the disciplinary authority of the Insurance Commissioner with regard to rebates and commissions (§§ 12410, 12411). The statutory scheme also regulates advisory organizations[9] (§ 12402 et seq. [art. 5.7]) and marketing representatives who work for regulated title entities (§ 12418 et seq. [art. 8]), as well as the deposit or collection of

---

[9] An " '[a]dvisory organization' " is a "person or entity (other than a title insurer, underwritten title company, or controlled escrow company) which recommends or prepares policy forms or endorsements, or procedural manuals (but not including the making of rates, rating plans, or rating systems), or which collects and furnishes to its members or insurance supervisory officials loss and expense statistics or other statistical information and data relating to the business of title insurance and who otherwise acts in an advisory, as distinguished from a ratemaking, capacity. No duly authorized attorney at law acting in the usual course of his profession nor any entity engaging in the above activity on a nationwide basis shall be deemed to be an advisory organization." (§ 12340.8.)

26

items connected with an escrow, the disbursement of funds from escrow accounts, and interest on escrow fund deposits (§§ 12413.1, 12413.2, and 12413.5 [art. 6]). It requires regulated title entities to submit business plans (§§ 12396 et seq. [art. 4.5]) and to pay annual renewal fees (§§ 12415 et seq. [art. 7]) to cover the costs of administering and enforcing the statutory scheme.

Although the statutory scheme regulates a broad range of activity in the business of title insurance, the section 12414.26 immunity by its own terms is expressly limited to " 'act[s] done, action[s] taken, or agreement[s] made pursuant to the authority conferred by *Article 5.5* . . . or *Article 5.7* . . . of' " Chapter 1. "Article 5.5 applies only to rate regulation, article 5.7 only to advisory organizations which supply data related to rate making." (*Quelimane Co. v. Stewart Title Guaranty Co*. (1998) 19 Cal.4th 26, 44-45, fn. omitted (*Quelimane*).) As our summary in the previous paragraph illustrates, Chapter 1 regulates several aspects of the business of title insurance that are unrelated to rate making and advisory organizations. We therefore reject the assertion that immunity applies to "all conduct Fidelity performs in conducting the business of tile insurance."

**F. The Authority Conferred by Article 5.5**

As we have noted, section 12414.26 provides: "No act done, action taken, or agreement made pursuant to the authority conferred by Article 5.5 . . . of this chapter shall constitute a violation of or grounds for . . . civil proceedings . . . ." In determining the scope of the section 12414.26 immunity, we next examine what is meant by "the authority conferred by Article 5.5." Since this case involves the rate filings of an underwritten title company and not an advisory organization, we are not concerned with the scope of article 5.7 (§§ 12402-12402.2), which concerns advisory organizations.

When enacted, article 5.5 of Chapter 1 was expressly entitled "Rate Filing and Regulation." (Stats. 1973, ch. 1130, p. 2307.) The purpose of article 5.5 "is to promote the public welfare by regulating rates for the business of title insurance as herein

27

provided to the end that they shall not be excessive, inadequate or unfairly discriminatory." (§ 12401.) The provisions of article 5.5 (§§ 12401 to 12401.10) require regulated title entities to establish "basic classifications of coverages and services to be used as the basis for determining rates" (§ 12401.2) and to file their "schedules of rates . . . and every modification thereof" that they propose to use in California with the Insurance Commissioner (§ 12401.1).

Section 12401.1 provides in relevant part: "Every . . . underwritten title company . . . shall file with the commissioner its schedules of rates, . . . and every modification thereof which it proposes to use in this state. . . . Every filing shall set forth its effective date, which shall be not earlier than the 30th day following its receipt by the commissioner, and shall indicate the character and extent of the coverages and services contemplated."

Section 12401.3 contains detailed standards that "apply to the making and use of rates" under article 5.5. It repeats the purpose of the statutory scheme that "[r]ates shall not be excessive or inadequate, . . . nor shall they be unfairly discriminatory" and, among other things, defines when a rate is "excessive" or "inadequate." (§ 12401.3, subd. (a).) Section 12401.4 permits the exchange of information between the commissioner, persons and entities in the business of title insurance, and advisory organizations "to further uniform administration of rate regulatory laws." Section 12401.7 provides in pertinent part: "No [regulated title entity] shall use any rate in the business of title insurance prior to its effective date . . . ." Sections 12401.71 and 12401.8 set forth exceptions to section12401.7. Section 12401.71 permits regulated title entities to "use a new rate prior to 30 days after filing" if it results in a rate reduction and meets other requirements.

28

Section 12401.8 specifies the circumstances under which rates "in excess of those set forth in a rate filing which has become effective" may be used.[10]

Unlike other types of insurance, title insurance rates need not be *approved* by the insurance commissioner prior to their use. (See §§ 1861.01, subd. (c) ["insurance rates . . . must be approved by the commissioner prior to their use."], 1851 [the provisions regarding rate approval "shall apply to all insurance on risks or on operations in this state, except: [seven classes of insurance, including] "(d) Title insurance."].)

Dwayne Buggage, who was an analyst in the DOI's rate filing bureau for more than 20 years, testified at trial. He explained that in regulating the business of title insurance, the DOI *accepts* regulated title entities' filed rates, but does not *approve* them. As an analyst, he reviews the filings "to make sure that they make sense at least to [him]." He looks for ambiguity in the rates, "to see if there's more than one rate set for one risk" and to "make sure that . . . the rates are not excessive or inadequate or discriminatory," which is consistent with the purposes of article 5.5. After he completes his review and analysis, the rate filings are reviewed by his bureau chief. Rate filings may be accepted or rejected by the DOI or withdrawn by the filer. If rejected, it is usually because the filing is incomplete. If Buggage rejects a rate filing, he sends a letter to the filer explaining the deficiency. The filer will either (1) address the deficiency and resubmit the rate schedule or (2) request a hearing before an administrative law judge to contest the DOI's decision.

---

[10] Section 12401.8 provides in relevant part that charges in excess of those set forth in the rate filing may be made when the regulated title entity includes a statement in its rate filing that "such charges may be made in the event . . . unusual services are performed." It also requires that the charges be "reasonably commensurate with . . . the costs of the services performed" and that "each person or entity obligated to pay such charges consents thereto in writing in advance." (§ 12401.8.)

## G. Case Law Interpreting Section 12414.26 and Analogous Immunity Statutes

We turn next to the case law interpreting section 12414.26 and two analogous immunity provisions in the Insurance Code.

The only published California case that discusses the immunity in section 12414.26 is *Quelimane*, *supra*, 19 Cal.4th 26. In *Quelimane*, the Supreme Court considered whether Insurance Code provisions governing title insurance barred a civil action, including claims under the UCL, by plaintiffs (landowners) who alleged they had been harmed by a conspiracy among title insurers to refuse to sell title insurance on real property in El Dorado County with a tax sale in the chain of title. (*Id.* at pp. 33, 43, 48-49.) The defendants in *Quelimane*, three title insurers, argued they were not subject to the UCL based on the immunity in section 12414.26 and the language of section 12414.29. (*Id.* at pp. 44-45, fn. omitted.) The court held "[t]he scope of these sections is expressly limited to articles 5.5 and 5.7 of [the chapter that] governs title insurance. Article 5.5 applies only to rate regulation, article 5.7 only to advisory organizations which supply data related to ratemaking." (*Id.* at pp. 44-45.) The court rejected the insurers' contention that section 12414.29 barred the plaintiffs' UCL claim and held that the Legislative purpose of section 12414.29 "was to preempt local regulation, not to exempt title insurers from other state laws governing unfair business practices." (*Id.* at p. 45.) The Supreme Court faulted the Court of Appeal for failing to "consider the restriction to ratemaking-related activities in . . . sections 12414.26 and 12414.29." (*Id.* at p. 46.) The court held that "the Insurance Code does not displace the UCL except as to title insurance company activities related to rate setting." (*Id.* at p. 33.) It concluded the complaint at issue sufficiently alleged concerted action in restraint of trade that violated the Cartwright Act, and held that "a title insurer's violation of the Cartwright Act *in conduct unrelated to rate fixing* may be the predicate for a UCL action." (*Id.* at p. 51, italics added.) Since the case involved an alleged conspiracy to

30

refuse to sell title insurance on certain types of property, and not ratemaking activity, it was not barred by the section 12414.26 immunity

Two federal district court cases have discussed the section 12414.26 immunity. We find those cases persuasive. In *Lyons v. First American Title Ins. Co*. (N.D. Cal. Dec. 22, 2009, No. C 09-4156 PJH) 2009 U.S. Dist. Lexis 119859 (*Lyons*), the court held that a civil action against a title insurer alleging race discrimination based on the title insurer's use of different rates for persons with " 'non-prime' " or " 'sub-prime' " mortgages from those with other types of mortgages actually took issue with two separate refinance rates that had been filed and disclosed under article 5.5 and was therefore barred by the section 12414.26 immunity. (*Id.* at pp. *3-*4, *17-*19.) The court in *In re Cal. Title Ins. Antitrust Litigation* (N.D. Cal. Nov. 6, 2009, C 08-01341 JSW) 2009 U.S. Dist. LEXIS 103407 held that a UCL claim based on alleged illegal rebates, kickbacks, and commissions did not involve ratemaking and was therefore not barred by the section 12414.26 immunity.[11]

In *State Compensation Insurance Fund v. Superior Court* (2001) 24 Cal.4th 930 (*SCIF*), the California Supreme Court construed section 11758, an immunity provision that is analogous to section 12414.26.[12] The plaintiffs in that case, businesses that were insured by SCIF, on behalf of themselves and other insureds, alleged that SCIF had misallocated medical-legal expenses and misreported their financial information to the

---

[11] The statutes prohibiting such conduct (§§ 12404, 12405) are in article 6 not article 5.5 of Chapter 1 (Title Insurance).

[12] Section 11758 provides: "No act done, action taken or agreement made pursuant to the authority conferred by this article shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance." The article referred in section 11758 is article 3 (Rating and Other Organizations) of chapter 3 (Regulation of Business of Workers' Compensation Insurance) of part 3 of division 2 of the Insurance Code.

Workers' Compensation Insurance Rating Bureau.  As a result, the insureds' experience modifications were artificially inflated, which allowed SCIF to collect excessive premiums from the insureds.  (*Id.* at pp. 933-934, 936.)  The parties disputed whether the case involved ratemaking.  (*Id.* at p. 936.)  "While the question [was] close," the Supreme Court concluded that the plaintiff's allegations related to SCIF's misconduct before it sent the data to the rating bureau and did not "challenge the method by which the rate or premium charged was set, but rather the insurer's misallocation of certain expenses," and, that section 11758 did not immunize SCIF from civil liability under those circumstances. (*Id.* at pp. 932, 942, 944.)

The parties rely on cases that construe the immunity provision in section 1860.1, which contains language similar to that of sections 12414.26 and 11758.  Section 1860.1 provides:  "No act done, action taken or agreement made pursuant to the authority conferred by *this chapter* shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance."  (Italics added.)  The chapter referenced in section 1860.1 is chapter 9 (Rates and Rating and Other Organizations) of part 2 (The Business of Insurance) of division 1 (General Rules Governing Insurance) of the Insurance Code (hereafter, sometimes "Chapter 9").  Chapter 9 applies to "all insurance" except seven classes of insurance that are expressly excluded in section 1851; notably, the exclusions include title insurance.  (§ 1851, subd. (d).)  The section 1860.1 cases were decided after the passage of Proposition 103, which made " ' "numerous fundamental changes in the regulation of automobile and other types of insurance." ' "  (*Walker v. Allstate Indemnity Co*. (2000) 77 Cal.App.4th 750, 752 (*Walker*).)

The court in *Walker* considered a civil action by a putative class of auto insurance customers against more than 70 auto insurers and the Insurance Commissioner alleging four causes of action, including a UCL claim, based "on the insurers' charging approved rates alleged nevertheless to be 'excessive.' "  (*Walker*, *supra*, 77 Cal.App.4th at pp. 752-

32

753.)  The court observed that "[h]istorically, [sections 1860.2 and 1860.2] have been interpreted to provide exclusive original jurisdiction over issues related to ratemaking to the commissioner.  (See *Chicago Title Ins. Co. v. Great Western Financial Corp.* (1968) 69 Cal.2d 305, 323 . . . ['a court is not the appropriate initial arbiter of factors involved in insurance costs']; [citation]."  (*Id.* at p. 755.)

One issue in *Walker* was whether the changes "wrought" by Proposition 103 affected the immunity provision in section 1860.1.  (*Walker*, *supra*, 77 Cal.App.4th at pp. 755-756.)  The court held that section 1860.1 barred the plaintiffs' claims, stating:  "If section 1860.1 has any meaning whatsoever . . . , the section must bar claims based upon an insurer's charging a rate that has been approved by the commissioner . . . ."  (*Id.* at p. 756.)  The court observed that under the statutory "scheme, the *commissioner* is charged with setting rates after an extensive hearing process in which consumers and interested parties are encouraged to participate. . . .  When this process has run its course, the insurers must charge the approved rate and cannot be held civilly liable for so doing.  [Citations.]  A consumer or an interested party is, however, provided the opportunity to petition the commissioner to review the continued use of any approved rate, i.e. obtain prospective, not retrospective, relief.  [Citations.]  . . . [U]nder the statutory scheme . . . , the charging of an approved rate cannot be deemed 'illegal' or 'unfair' for purposes of the [UCL] or, indeed, tortious."  (*Id.* at p. 756.)  The court explained that section 1860.1 states that an " 'action taken . . . pursuant to the authority conferred by [Chapter 9]' " cannot constitute grounds for civil proceedings, and reasoned that "[w]hatever else [Chapter 9] does, it definitely confers authority upon the commissioner to approve rates.  Moreover, an insurer's action of collecting premiums consistent with an approved rate is certainly done pursuant to the authority conferred on the commissioner by [Chapter 9]."  (*Id*. at pp. 756–757.)  Thus, the court concluded the plaintiffs' civil action challenging the approved rates was barred by sections 1860.1 and 1860.2.  (*Id.* at pp. 754, 760.)

In *Donabedian v. Mercury Ins. Co*. (2004) 116 Cal.App.4th 968, a policyholder sued his automobile insurer under the UCL alleging the insurer improperly used his lack of prior insurance as a criterion to determine insurability, the amount of his premium, and eligibility for two discounts.  The court held the UCL action was not barred because it did not involve a challenge to approved rates but instead involved how the components of the insurer's class plan were applied to the public.  (*Id.* at pp. 991-993.)

The plaintiff in *Krumme v. Mercury Ins. Co*. (2004) 123 Cal.App.4th 924, 928, 936 (*Krumme*), filed a UCL action challenging the practice of three related insurers of selling auto and other personal lines of insurance through brokers who were actually the insurers' agents but charged broker fees.  The plaintiff complained that the broker fees were not disclosed to the DOI or in the insurers' comparative premium rate advertising and alleged that since the insurers' rates failed to disclose that they would be charged broker fees, the premiums appeared deceptively low.  (*Id.* at p. 932.)  The defendants argued that if the allegedly illegal broker fees were part of the premium it charged, the matter came within the Insurance Commissioner's plenary authority over rates and premiums.  The appellate court concluded the case did not involve ratemaking, since the plaintiff alleged the insurers violated provisions of the Insurance Code regulating brokers and engaged in false advertising.  (*Id.* at pp. 936-937.)

The court in *Krumme* explained:  "The elaborate statutory and administrative process for setting rates has 'been interpreted to provide exclusive original jurisdiction over issues related to ratemaking to the commissioner.'  ([*Walker*], *supra*, 77 Cal.App.4th 750, 755.)  The Insurance Code does not, however, displace the UCL 'except as to . . . activities related to rate setting.'  (*Quelimane*[, *supra*,] 19 Cal.4th 26, . . . ; see [*Walker*], at p. 759.)  . . . 'A judicial act constitutes rate regulation only if its principal purpose and direct effect are to control rates. . . .  In general, a claim that directly challenges a rate and seeks a remedy to limit or control the rate prospectively or retrospectively is an attempt to regulate rates,' but 'a claim that directly challenges some other activity, *such as false*

34

*advertising . . .* is not rate regulation.' [Citation.] A claim predicated on a violation of the Insurance Code not related to ratemaking may thus be framed as a claim under the UCL. [Citation.]" (*Krumme*, *supra*, 123 Cal.App.4th at pp. 936-937.)

The plaintiffs in *MacKay*, brought a class action lawsuit alleging violations of the UCL against 21st Century Insurance. They alleged they paid increased premiums due to a lack of prior insurance and that the defendant used two impermissible factors to determine auto insurance rates that were based on the lack of prior insurance: accident verification and persistency. (*MacKay*, *supra*, 188 Cal.App.4th at pp. 1433-1434.) The parties in *MacKay* disputed whether accident verification had been approved by the DOI as a rating factor. (*Id.* at pp. 1435-1436.) The court reviewed the history of the rate filings and a DOI enforcement action against the insurer and held that accident verification had been approved by the DOI as a rating factor in that case. (*Id.* at pp. 1436-1439.) The court concluded that the DOI's prior approval of the rating factor precluded a civil action challenging it, the UCL claim was barred by the immunity in section 1860.1, and the "statutory provisions for an administrative process (and judicial review thereof) were the exclusive means of challenging an approved rate." (*Id.* at pp. 1432, 1449-1451.)

In summary, the cases hold that the immunity provisions in the Insurance Code (§§ 1860.1, 11758, 12414.26) barred civil actions that challenged as excessive auto insurance rates that had been approved by the Insurance Commissioner (*Walker*, *supra*, 77 Cal.App.4th 756-757), the use of rating factors that had been approved by the Insurance Commissioner to set auto insurance rates (*MacKay*, *supra*, 188 Cal.App.4th 1449-1451), and a race discrimination case that was actually a challenge to title insurance rates that had been accepted by the Insurance Commissioner (*Lyons*, *supra*, 2009 U.S. Dist. Lexis 119859, *15). On the other hand, statutory immunity did not bar civil actions that were unrelated to rate making, including actions based on an alleged conspiracy to refuse to provide title insurance (*Quelimane*, *supra*, 19 Cal.4th 44-46, 51); false

35

advertising (*Krumme*, *supra*, 123 Cal.App.4th at pp. 936-937); misallocating medical-legal expenses in reports submitted to the WCIRB (*SCIF*, *supra*, 24 Cal.4th 932, 942, 944); violating statutes that regulate insurance brokers (*Krumme*, at p. 936-937); and charging illegal rebates, kickbacks, and commissions (*In re Cal. Title Ins. Antitrust Litigation*, *supra*, 2009 U.S. Dist. LEXIS 103407).

### H. Analysis

*Quelimane* instructs that the immunity applies to "ratemaking-related activities"; we must therefore determine whether the conduct at issue here is "related to ratemaking." (*Quelimane*, *supra*, 19 Cal.4th at p. 46.)  As the cases illustrate, whether the action is barred by statutory immunity turns on the wrong alleged.

In our view, this case is more like the cases that involved activities related to ratemaking than those that did not.  Plaintiffs do not allege a conspiracy to refuse to provide title insurance (*Quelimane*, *supra*, 19 Cal.4th 44-46, 51); false advertising (*Krumme*, *supra*, 123 Cal.App.4th at pp. 936-937); misallocating or misrepresenting information in a report to an advisory agency (*SCIF*, *supra*, 24 Cal.4th 932, 942, 944); violating statutes that regulate insurance brokers or title insurance representatives (*Krumme*, at p. 936-937; § 12418 et seq.); charging illegal rebates, kickbacks, or commissions (*In re Cal. Title Ins. Antitrust Litigation*, *supra*, 2009 U.S. Dist. LEXIS 103407; §§ 12404-12411).  Nor does the complaint allege any violations of the statutes governing Fidelity's actual handling of the escrow (§§ 12413.1-12413.5)—which are not in article 5.5—as opposed to the rates charged for its services.

Applying section 12414.26 to the different theories of liability asserted at trial aids the analysis.  Plaintiffs' Delivery Theory No. 2 and the General Draw Deed Theory challenged the language of Fidelity's filed rates.  Under Delivery Theory No. 2, Plaintiffs argued that Fidelity's base rate for escrow services set forth in the filing included the cost of delivery services and that by charging for delivery services in addition to the base rate,

Fidelity was billing them twice. The general Draw Deed Theory argued that drawing a deed was not the same as "document preparation" for which there was a filed rate. These theories required the court to interpret Fidelity's rate filings to determine whether they encompassed the charges at issue. This was a challenge to the rates as filed by Fidelity. Since these theories challenged the "basic classifications of . . . services [Fidelity established] to be used as the basis for determining rates" (§ 12401.2) and the rate schedules Fidelity filed with the Insurance Commissioner (§ 12401.1), they involved acts done "pursuant to the authority conferred by Article 5.5" (§ 12414.26) and are subject to the immunity. Thus, we disagree with the trial court's conclusion that the section 12414.26 immunity did not apply to Delivery Theory No. 2 and the General Draw Deed Theory. (As noted, Plaintiffs have elected not to pursue their claims under either of these theories on appeal.)

The more difficult question is whether the immunity applies to Plaintiffs' Delivery Theory No. 1 and the Draw Deed Theory of the Gap Period Plaintiffs. The gravamen of these claims is that Fidelity charged for delivery services and some draw deed services that it did not include in its rate filings and that were therefore not accepted by the Insurance Commissioner. Alternatively, the claim may be framed as Fidelity's failure to include in its rate filings amounts it charged for third party delivery services and some draw deed fees. Broadly speaking, these claims appear to be related to Fidelity' rate-making activities.

Furthermore, the primary legal issue under Delivery Theory No. 1 is whether Fidelity was required to file a rate for delivery services performed by third party vendors. The trial court concluded it was and Fidelity challenges that finding on appeal. Generally speaking, the question whether a regulated title entity is required to include the cost of services performed by third parties in its rate filings appears to be related to ratemaking activity.

We conclude Plaintiffs' challenge to charges or rates that were not listed in Fidelity's rate filings fall within the authority conferred by article 5.5. The statues in article 5.5 directed Fidelity to establish basic classifications of services to use as the basis for determining its rates (§ 12401.2), to file its scheduled of rates with the Insurance Commissioner (§ 12401.1), to indicate the character and extent of the services contemplated in its rate filings (§ 12401.1), and prohibited Fidelity from using any rate "prior to its effective date nor prior to the filing with respect to such rate having been publicly displayed and made readily available to the public for a period of no less than 30 days . . . " (§ 12401.7). Fidelity failed to establish rates for third party delivery services and document preparation for sales escrows during the Gap Period (§ 12401.2). And although Fidelity filed rate schedules with the Insurance Commissioner throughout the class period, its rate filings failed to indicate the character and extent of all the services contemplated (§ 12401.1). Fidelity also used rates or charges prior to any effective date established by a rate filing in violation of section 12401.7. Thus, Fidelity failed to comply with sections 12401.1, 12410.2, and 12401.7, all of which are in article 5.5 of Chapter 1. In our view, this conduct constitutes "act[s] done . . . pursuant to the authority conferred by Article 5.5" (§ 12414.26). Thus, the claims under Delivery Theory No. 1 and the Draw Deed claims of the Gap Period Plaintiffs are also barred by the section 12414.26 immunity.

## I. Statutory Scheme Governing Insurance Commissioner's Exclusive Original Jurisdiction Over Rate Making-related Activity

In construing section 12414.26, we examine the statutory language in "the context of the statute as a whole . . . with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." (*Smith*, *supra*, 39 Cal.4th at p. 83.) Our conclusion on the immunity question is strengthened by reviewing the statutes governing the Insurance Commissioner's exclusive original jurisdiction over the

business of title insurance and section 12304.7, which defines the term "rates" as used in Chapter 1.

The statutes governing the Insurance Commissioner's exclusive original jurisdiction over the business of title insurance are found in article 6.7 of Chapter 1, which is entitled "Hearings, Procedure, and Judicial Review." (§§ 12414.13-12414.19; Stats. 1973, ch. 1130, p. 2311.) Article 6.7 contains procedures for complaints against regulated title entities regarding their rates and the entity's compliance with article 5.5. The statutory scheme provides for three levels of review: (1) informal review of the complaint by the regulated entity itself, (2) followed by a complaint to and possible hearing before the Insurance Commissioner, (3) followed by judicial review in the courts. (§§ 12414.13-12414.19.)

More specifically, the statutory scheme provides that "[a]ny person aggrieved by *any rate charged*, rating plan or rating system followed or adopted by a [regulated title entity] may request such person or entity to review the manner in which *the rate*, plan, system, or rule has been applied . . . ." (§ 12414.13, italics added.) If the regulated title entity refuses to review that matter or fails to grant the relief requested, "[a]ny person aggrieved by the action . . . may file a written complaint and request for hearing" with the Insurance Commissioner. (§ 12414.13.) Section 12414.13 sets forth reasons, both discretionary and mandatory, for the commissioner to deny a hearing.[13] "Otherwise, and if [the commissioner] finds that the complaint charges a violation of Article 5.5 . . . and that the complainant would be aggrieved if the violation is proved, [the commissioner] shall proceed as provided in Section 12414.14." (§ 12414.13.)

---

[13] Section 12414.13 provides that "[i]f the commissioner has information concerning a similar complaint he may deny the hearing. If he believes that probable cause for the complaint does not exist or that the complaint is not made in good faith he shall deny the hearing."

Section 12414.14 provides that if the Insurance Commissioner has good cause to believe a regulated title entity or "*any rate*, rating plan or rating system made or used by any such person or entity does not comply with the requirements and standards of Article 5.5," the commissioner shall give written notice of noncompliance and specify a "reasonable time, . . . , in which such noncompliance may be corrected," unless there is good cause to believe such noncompliance is willful. (§ 12414.14, italics added.) If the commissioner "has good cause to believe such noncompliance to be willful," or if within the period prescribed by the commissioner the regulated title entity does not correct the noncompliance "or establish to the satisfaction of the commissioner that such specified noncompliance does not exist, then the commissioner may hold a public hearing." (§ 12414.15.)

The statutory scheme sets forth the powers of the commissioner upon finding a violation or finding the violation was willful or finding the regulated entity has not complied with the commissioner's orders in the matter. (§§ 12414.16–12414.18.) It also provides for judicial review of any findings, rulings, or orders by the commissioner and contains procedural rules governing such review. (§ 12414.19.)

In addition to reviewing complaints by aggrieved persons, the Insurance Commissioner may investigate ratemaking activity on his or her own initiative. The commissioner "may, . . . , make or cause to be made an examination of every" regulated title entity "to ascertain whether such person or entity and *every rate* and rating system used in the business of title insurance complies with the requirements and standards of Article 5.5 (commencing with Section 12401) . . . ." (§ 12414.21, italics added; see also Cal. Code Regs., tit. 10, § 2355.4.) The Insurance Commissioner may examine the officers, managers, agents, and employees of regulated title entities under oath and order the production of records, documents, statistics, data, and other information "to which such examination relates." (§ 12414.22, 12414.23; Cal. Code Regs., tit. 10, § 2355.4.)

40

The Insurance Code defines the term " 'rate' " or " 'rates' " as used in Chapter 1 as "the *charge* or *charges*, . . . , made to the public by [a regulated title entity], *for all services it performs in transacting the business of title insurance*."[14]  (§ 12340.7, italics added.)  By its express language, section 12414.13—which governs informal requests for review and complaints and requests for hearing to the Insurance Commissioner—applies to grievances based on "any rate charged" by a regulated title entity.  The statute's use of the phrase "any rate charged" in addition to "rating plan or rating system" indicates it applies to any charge, and not just rates or charges that are included in a rating plan or rating system (i.e., schedule of rates) that has been accepted by the Insurance Commissioner.

Section 12414.13 empowers the Insurance Commissioner to act when a "complaint charges a violation of Article 5.5."  Similarly, section 12414.14 empowers the Insurance Commissioner to act when "*any rate*, rating plan or rating system made or used" by a regulated title entity does not comply with the requirements and standards of Article 5.5" and section 12414.21 empowers the Insurance Commissioner to ascertain whether "*every rate* and rating system" complies with article 5.5.  (Italics added.)  Thus, the statutes governing administrative review of rates support the conclusion that the

---

[14]  Section 12340.7 provides:  "Except as provided in Section 12401.8, and excluding miscellaneous charges, "rate" or "rates" means the charge or charges, whether denominated premium or otherwise, made to the public by a title insurer, an underwritten title company or a controlled escrow company, for all services it performs in transacting the business of title insurance. As used in this section miscellaneous charges means conveyancing fees, notary fees, inspection fees, tax service contract fees and such other fees as the commissioner by regulation may prescribe."  As we have noted, section 12401.8 states the circumstances under which a regulated title entity may charge amounts in excess of its filed rates.  This case does not involve conveyancing fees, notary fees, inspection fees, or tax service contract fees, and the Insurance Commissioner has not promulgated any regulations that expands the list of "miscellaneous charges" to include delivery services or document preparation fees.  (Cal. Code Regs., tit. 10, §§ 2355.1-2355.5.)

Insurance Commissioner's plenary authority over ratemaking extends to "any rate charged" and "every rate" not just the rates set forth in a rate filing that has been accepted by the Insurance Commissioner. Plaintiffs allege Fidelity failed to comply with article 5.5 by charging rates for services that were not listed in its rate filings and failing to include rates for third party delivery services and some document preparation in its rate filings. The statutes in article 6.7 of Chapter 1, particularly sections 12414.13, 12414.14, and 12414.21, expressly provide that Plaintiffs' claims fall within the exclusive original jurisdiction of the Insurance Commissioner. Thus, article 6.7of Chapter 1 supports our conclusion that this case is barred by the immunity in section 12414.26.

## J. Effect of Section 12414.27 on Immunity Conferred by Section 12414.26

### 1. Language of Section 12414.27

Plaintiffs contend the conduct at issue here is expressly excluded from the section 12414.26 immunity for ratemaking-related activity by the language of section 12414.27. Fidelity argues section 12414.27 does not limit the immunity.

Section 12414.27 provides: "Commencing 120 days following January 1, 1974, no [regulated title entity] shall charge for any title policy or service in connection with the business of title insurance, except in accordance with rate filings which have become effective pursuant to Article 5.5 . . . or as otherwise authorized by such article; provided, however, where a rate is on file with the commissioner and in effect immediately prior to such date, such rate shall continue in effect until a new rate filing is thereafter made and becomes effective in the manner provided in Article 5.5 . . . of this chapter."

Plaintiffs argue section 12414.27 prohibits the conduct at issue in this case: charging for services for which there has been no rate filing. Plaintiffs argue a violation of section 12414.27 cannot be immunized by section 12414.26 because the section 12414.26 immunity applies to "act[s] done, action[s] taken, or agreement[s] made

42

pursuant to the authority conferred by Article 5.5" and section 12414.27 is in article 6.9, not article 5.5. They argue that if the Legislature had intended to provide a broad immunity that applies to any fees charged, even those for which no rate has been filed, it would not have enacted section 12414.27 or placed it in article 6.9 to which the section 12414.26 immunity does not apply.

Fidelity advocates another interpretation and urges us to read section 12414.27 as "the grace period or savings statute the Legislature intended." Fidelity argues: "[h]aving established new rate regulation in article 5.5, the Legislature needed an implementing statute to govern when new requirements take effect, and what happens with rates already on file under the old law." It contends the Legislature drafted section 12414.27 as a miscellaneous procedural statute and placed it in article 6.9 for that reason. Fidelity argues the first clause in section 12414.27—which states "[c]ommencing 120 days following January 1, 1974"—"expressly provides a grace period to adjust to the new law, by postponing the operative date of Article 5.5's rate regulation." Fidelity adds that the "second clause simply means that if title insurers were already using rates on file, they did not have to re-file them under Article 5.5."

Thus, the question presented is whether section 12414.27 is a prohibitory statute that carves out an exception to the section 12414.26 immunity or an implementing statue that establishes an operative date for the rate filing and regulatory scheme in article 5.5. Section 12414.27 does contain prohibitory language. It states: "no [regulated title entity] shall charge for any . . . service . . . , except in accordance with rate filings that have become effective . . . ." Although the Legislature placed section 12414.27 directly after the immunity provision in section 12414.26 and outside article 5.5, section 12414.27 does not mention section 12414.26 or otherwise indicate an intent to modify the scope of the immunity provided by section 12414.26.

The interpretation advanced by Plaintiffs does not take into account the first clause of section 12414.27: the words "[c]ommencing 120 days following January 1, 1974."

43

(§ 12414.27.)  A brief review of the statute's history helps illuminate the language of the first clause.  The statutory scheme at issue was enacted in 1973; it amended, repealed, and added several provisions to the Insurance Code.  (Stats. 1973, ch. 1130, pp. 2300-2315.)  The Legislation was signed by the Governor on October 2, 1973 and took effect on January 1, 1974.  (Stats. 1973, ch. 1130, p. 2300; Gov. Code, § 9600.)  The timing of the enactment supports the conclusion that the legislative intent behind section 12414.27 was to delay the operative date of the rate filing regulatory scheme in the new legislation. In other words, although the statutory scheme took effect on January 1, 1974, section 12414.27 provides that the rate filing and regulatory provisions of article 5.5 would not be operative until 120 days after the effective date of the new legislation.

"It has long been recognized that a statute may legally be framed to provide for an effective date and an operative date.  [Citations.]  In the usual situation, the effective date and the operative date are one and the same; however, the power to enact laws includes the power to fix a future date on which the act will become operative.  [Citation.]" (*Estate of Rountree* (1983) 141 Cal.App.3d 976, 980.)  "The Legislature may provide for an operative date subsequent to the effective date of a statute to allow persons affected to become acquainted with and implement its provisions, as well as to give lead time to the governmental authorities to establish machinery for the operation of or implementation of the new law." (*Id.* at p. 980, fn. 3.)

### 2.  Legislative History of Section 12414.27

The legislative history of section 12414.27 supports the conclusion that the Legislature's intent was to delay implementation of the new statutory scheme, not to limit the immunity provision in section 12414.26.  The statutes at issue were enacted by Senate Bill No. 1293, which was introduced in May 1973 at the request of the California Land

44

Title Association. (Enrolled Bill Memo to Gov. for Sen. Bill No. 1293 (1993-1994 Reg. Sess.)[15] Sept. 30, 1973; Sen. Final Hist. (1973-1974 Reg. Sess.), p. 568.)

According to the Assembly Committee on Finance and Insurance analysis, the bill proposed "to regulate the organization and rate making of title insurance companies, underwritten title companies, and controlled escrow companies. It requires that the rates be subject to the same tests [that were] applied to other types of insurance by the MacBride-Grunsky Rating Law. This requires that the rates not be inadequate nor excessive nor unfairly discriminatory. [¶] Rates, as established by the individual companies or by rating organizations, would be filed with the Insurance Commissioner who would have the right to review such rates. *Procedures are provided for the review of the rates and for administrative and judicial hearing if rates are found to be in violation of the rating act.* [¶] Under current statutory law, rates of title insurance companies are not regulated. . . . [This bill] would subject future rating of title insurance policies to review by the Insurance Commissioner and thus permit the use of rating organizations which could be used to develop rates to be made available to the members of the rating organization." (Assem. Com. on Finance and Insurance, Analysis of SB 1293, as amended Aug. 27, 1973, italics added.)

The bill was amended three times. (Assem. Amend. to SB 1293 Sept. 10, 1973, p. 1.) When originally proposed, the legislation did not include either section 12414.26 or section 12414.27. (SB 1293 as introduced May 3, 1973, pp. 28-30.) Instead, the original bill contained a Section 20, which provided: "The Legislature finds and declares that the changes in the law affecting the business of title insurance made by this act constitute a major departure from preexisting law and that compliance with this act will require the formulation, adaptation and implementation of new regulatory and business

---

[15] Hereafter, we shall use the shorthand reference "SB 1293" in place of the phrase "Sen. Bill No. 1293 (1993-1994 Reg. Sess.)" in legal citations.

45

practices by the Insurance Commissioner and persons and entities engaged in the business of title insurance in this state.  In order to promote the public welfare and to assure an orderly method of transition from the requirements of preexisting law to compliance with the requirements of this act the Legislature hereby directs that the provisions of this act be implemented in the following manner."  (SB 1293 as introduced May 3, 1973, at p. 31.)[16]  Section 20 then set forth a proposed schedule of three staggered operative dates for implementing the new legislation and specified which statutes would become operative on each date.  By the first date, the Insurance Commissioner was to promulgate certain regulations and forms.  By the second date, the newly regulated title entities were to file their schedules of rates.  (*Ibid.*)

Section 12414.27 was added to the bill by amendment in August 1973; the language of the statute has not changed since then.  (Assem. Amend. to SB 1293 Aug. 27, 1973, p. 22.)  As we have noted, it provides:  "Commencing 120 days following January 1, 1974, no [regulated title entity] shall charge for any title policy or service in connection with the business of title insurance, except in accordance with rate filings which have become effective pursuant to Article 5.5 . . . or as otherwise authorized by such article; provided, however, where a rate is on file with the commissioner and in effect immediately prior to such date, such rate shall continue in effect until a new rate filing is thereafter made and becomes effective in the manner provided in Article 5.5 . . . ."

The August 1973 amendment also deleted Section 20, the uncodified provision that described the need for an "orderly method of transition" and provided for staggered operative dates.  (Assem. Amend. to SB 1293 Aug. 27, 1973, pp. 36-37.)  The Legislature replaced the staggered schedule in Section 20 with a single, delayed operative date for

---

[16] For ease of reference, we shall refer to his uncodified portion of the bill as "Section 20."  References to "Section 20" in this opinion are not to section 20 of the Insurance Code, which defines the term "commissioner" as used in that code.

rate filings and replaced the 60-day grace period in Section 20 with a 120-day grace period after the legislation's operative date for regulated entities to get their rates on file. Rather than keep these provisions in an uncodified section of the bill, the Legislature added a statute (§ 12414.27) that expressly set forth the delayed operative date for the rate filing requirement and provided that after that date no regulated title entity shall charge for any service except in accordance with its rate filings.

Prior to 1974, the DOI regulated title insurers and underwritten title companies through licensing, setting minimum capital requirements, and reviewing audits. *Title insurers* were required to file their rates with the DOI, but the DOI did not regulate their rates. (Legis. Analyst, Analysis of SB 1293, Sept. 11, 1973, p. 1.) And there was no rate filing requirement for *underwritten title companies or controlled escrow companies*. This history supports the conclusion that the Legislature also intended by the language of section 12414.27 to authorize title insurers to use the rates already on file with the Insurance Commissioner after the new legislation took effect.[17]

We conclude, based on the language of the statute and this legislative history, that the purpose of section 12414.27 was to establish a delayed operative date for regulated title entities to prepare for the new statutory scheme and comply with the article 5.5 rate filing requirements and not to carve out an exception to immunity for cases such as this.

---

[17] Section 12414.26 was also added to the bill by the August 1973 amendment. (Assem. Amend. to SB 1293 Aug. 27, 1973, p. 22.) When added, section 12414.26 provided that "no act done, action taken, or agreement made pursuant to the authority conferred by *this chapter* shall constitute a violation of or grounds for prosecution or civil proceedings . . . ." (*Ibid.*) Thus, when added to the bill, the section 12414.26 immunity applied to the entire Chapter 1 and all aspects of the business of title insurance governed by that chapter. When the bill was amended in September 1973, the phrase "the authority conferred by this chapter" was changed to "the authority conferred by Article 5.5 . . . or Article 5.7 . . . of this chapter." (Assem. Amend. to SB 1293 Sept. 10, 1973, p. 22.) The September 1973 amendment demonstrates the intent to limit the section 12414.26 immunity to ratemaking-related activity and advisory organizations.

Moreover, while section 12414.27 expressly prohibits charging for services "except in accordance with rate filings which have become effective pursuant to Article 5.5 . . . or as otherwise authorized by such article," that same conduct is also impliedly prohibited by the language of sections 12401.1, 12401.2, and 12401.7. As we have observed, sections 12401.1 and 12401.2 required Fidelity to establish classifications of services to be used as the basis for its rates, file its schedules of rates with the Insurance Commissioner, and indicate in its rate filings the character and extent of the services contemplated. (§§ 12401.1, 12401.2.) Section 12401.7 prohibited Fidelity from using any rate prior to its effective date or prior to the rate filing with respect to that rate having been publicly displayed and made readily available for 30 days prior to its effective date. (§ 12401.7.) Here, Fidelity failed to establish classifications of services for draw deed services for sales transactions during the Gap Period and for third party delivery services. It also failed to indicate in its rate filings that it intended to charge for those services and used rates before they were included in a rate filing. By charging for such services, Fidelity has violated sections 12401.1, 12401.2, and 12401.7, which are in article 5.5. Thus, its conduct was subject to the section 12414.26 immunity.

For these reasons, we conclude the section 12414.26 immunity applies to Plaintiffs' UCL claims and that the immunity bars this action. Plaintiffs "may not bring a UCL action for restitution" or any other cause of action in a civil proceeding "that 'trespasses directly on the core function of the [Insurance] Commissioner' " concerning rate filing and regulation in the business of title insurance. (See *Loeffler*, *supra*, 58 Cal.4th at pp. 1126-1127.)

Plaintiffs are not left without a remedy. Article 6.7 of Chapter 1 describes the procedures for bringing this matter before the Insurance Commissioner. In its order on the attorney fees motion, the trial court observed that the Villanuevas did not present any evidence of any "presuit efforts to contact governmental authorities concerning public enforcement before filing a lawsuit." The court added, "[I]t appears to be undisputed that

48

Plaintiff did not attempt to contact the [DOI] prior to initiating the lawsuit. Plaintiff argues that no action had been taken by the [DOI] and the [DOI] could not have sought restitution as Plaintiff did. The fact that the [DOI] did not take action prior to the filing of Plaintiff's lawsuit does not necessarily mean the [DOI] would not have taken action had Plaintiff made such a request. Action by the [DOI] could have resulted in a much more efficient resolution of the issues raised in this action." Under article 6.7 of Chapter 1, the Insurance Commissioner has exclusive original jurisdiction over Plaintiffs' claims. That the Insurance Commissioner had not acted on his or her own initiative or could not seek restitution is not relevant to the jurisdictional analysis.

In light of our conclusion on the immunity issue, we shall not address the parties' other arguments in case No. H041870, except to note that immunity bars "civil proceedings." (§ 12414.26.) This includes Plaintiffs' cause of action based on an alleged breach of fiduciary duty.

### IV. *Appeals of Postjudgment Orders in Case No. H042504*

Both parties appeal the postjudgment order on attorney fees and costs. Plaintiffs contend the trial court erred when it denied their motion for attorney fees under Code of Civil Procedure section 1021.5, the private attorney general attorney fees statute. Fidelity argues the trial court erred when it awarded costs to Plaintiffs, denied Fidelity's motion to strike or tax Plaintiffs' costs, and granted Plaintiffs' motion to tax Fidelity's costs in their entirety.

### A. Order Denying Plaintiffs' Motion for Attorney Fees Under Code of Civil Procedure Section 1021.5

"[A] party seeking an award of Code of Civil Procedure section 1021.5 attorney fees must first be determined to be 'a successful party.' [Citation.] A necessary prerequisite to recovery under the statute is the status of the prevailing party. [Citation.] The terms 'prevailing party' and 'successful party' are synonymous. (*Graham v.*

49

*DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 570 . . . .)" (*Coalition for a Sustainable Future in Yucaipa v. City of Yucaipa* (2015) 238 Cal.App.4th 513, 521.)  Since we reverse the judgment, Plaintiffs are no longer a prevailing party and therefore cannot recover attorney fees under Code of Civil Procedure section 1021.5.  (*Ibid.*)

An order *awarding* attorney fees and costs "falls with a reversal of the judgment on which it is based" and "must also be reversed." (*Merced County Taxpayers' Ass'n v. Cardella* (1990) 218 Cal.App.3d 396, 402 (*Merced County*), citing *Purdy v. Johnson* (1929) 100 Cal.App. 416, 421.)  In this case, the trial court entered an order *denying* Plaintiffs' motion for attorney fees, reasoning that they had not met the requirements of Code of Civil Procedure section 1021.5.  Since the trial court *denied* Plaintiffs' motion for attorney fees, albeit for reasons unrelated to the reversal of the judgment, we will affirm the order.  " '[W]e review the trial court's order, not its reasoning, and affirm an order if it is correct on any theory apparent from the record.' " (*Wal-Mart Real Estate Business Trust v. City Council of San Marcos* (2005) 132 Cal.App.4th 614, 625, quoting *Blue Chip Enterprises, Inc. v. Brentwood Sav. & Loan Assn.* (1977) 71 Cal.App.3d 706, 712.)  In addition, the reversal of the judgment renders Plaintiffs' challenge to the order denying their motion for attorney fees moot.  (*Merced County*, at pp. 401-402.)  Consequently, we will not address the parties' arguments on the motion for attorney fees further.

**B.  Order on Parties' Motions to Tax Costs**

Like orders awarding attorney fees, "[a]n order awarding costs falls with a reversal of the judgment on which it is based." (*Merced County*, *supra*, 218 Cal.App.3d at p. 402.)  Because we conclude that the judgment in favor of Plaintiffs must be reversed, the order awarding them costs must also be reversed.  (*County of Humboldt v. McKee* (2008) 165 Cal.App.4th 1476, 1501, citing *Merced County*, at p. 402.)

Since we reverse the judgment and order the action dismissed, Fidelity is "a defendant in whose favor a dismissal is entered" under Code of Civil Procedure section 1032 and is therefore a prevailing party, "entitled as a matter of right to recover costs" in this action.  (Code Civ. Proc., § 1032, subds. (a)(4), (b).)

The record is incomplete regarding the litigation of the costs claims.[18]  However, Plaintiffs' appendix contains a copy of the superior court's "On-line Document List," which serves as the register of actions.  (Cal. Rules of Court, rules 8.124(b)(1)(A), 8.122(b)(1)(F) [appendix must contain all items required to be included in a clerk's transcript, including the "register of actions, if any"].)  According to that list, Plaintiffs filed a motion to tax Fidelity's costs, Fidelity opposed the motion, and Plaintiffs filed a reply.  Since those papers are not in the record on appeal, we do not know what arguments Plaintiffs raised below.  More importantly, that motion was never adjudicated on the merits in the trial court.  The trial court concluded Plaintiffs were the prevailing party and awarded costs to Plaintiffs.  It also found Fidelity was not a prevailing party and granted Plaintiffs' motion to tax Fidelity's costs on that ground.  We will therefore remand this matter to the trial court to rule in the first instance on Plaintiffs' motion to tax Fidelity's costs and determine the amount of the costs award.

### DISPOSITION

The judgment in case No. H041870 is reversed.  The cause is remanded to the superior court with directions to vacate the judgment and enter a new judgment dismissing the action since it is barred by the section 12414.26 immunity.

The postjudgment order denying Plaintiffs' motion for attorney fees in case No. H042504 is affirmed.  The postjudgment order denying Fidelity's motion to tax

---

[18]  The only documents in the appendices regarding the parties' costs claims are the memoranda of costs and Plaintiffs' opposition to Fidelity's motion to strike or tax their costs.

51

Plaintiffs' costs, awarding Plaintiffs their costs of suit, and granting Plaintiffs' motion to tax Fidelity's costs is reversed. The cause is remanded to the superior court with directions to vacate its order awarding costs to Plaintiffs, to enter a new order awarding Fidelity its costs of suit, and to conduct a hearing on Plaintiffs' motion to tax Fidelity's costs.

The parties shall bear their own costs on appeal.


_____

ELIA, J.


WE CONCUR:



_____

PREMO, Acting P. J.



_____

GROVER, J.



*Villanueva v. Fidelity National Title Company*
H041870, H042504

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No.: 1-10-CV173356 |
| Trial Judge: | The Honorable Pete H. Kirwan |

| | |
|---|---|
| Attorneys for Plaintiffs and Appellants<br>Manny Villanueva et al.: | Chavez & Gertler<br><br>Nance F. Becker<br>Mark A. Chavez<br><br><br>The Kick Law Firm<br><br>Taras Kick<br>Thomas Segal |

| | |
|---|---|
| Attorneys for Defendant and Appellant:<br>Fidelity National Title Company: | Hahn Loeser & Park<br><br>Michael J. Gleason<br>Rupa G. Singh<br>Erica L. Calderas<br>Steven A. Goldfarb |

*Villanueva v. Fidelity National Title Company*
H041870, H042504